## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRETT M. GARDNER,** as Personal Representative of the Estate of MMG, deceased minor**; BRETT M. GARDNER,** individually**; JESSICA C. GARDNER,** individually**; GLEN GARDNER** as Conservator for HG | **CIVIL ACTION**<br><br>**NO.:**<br><br><br>**JURY TRIAL DEMANDED** |
| *Plaintiffs,*<br>vs. | |
| **DAVID CALLAN,** individually and as Director and President of Aredelmar S.A. and Playa Dulce Vida, S.A.**; R. SCOTT WILLIAMS,** individually and as Secretary of Aredelmar S.A. and Playa Dulce Vida, S.A.**; HAWK OPPORTUNITY FUND L.P.; AREDELMAR S.A.** d/b/a Arenas Del Mar Beachfront & Rainforest Resort**; PLAYA DULCE VIDA S.A.** d/b/a Arenas Del Mar Beachfront & Rainforest Resort; **DOES 1-100, inclusive,** | |
| *Defendants.* | |

## COMPLAINT – CIVIL ACTION

Plaintiffs, Brett M. Gardner, individually and as Personal Representative of the Estate of MMG, a deceased minor; Jessica C. Gardner, individually and Glen Gardner, as Conservator for HG, by and through the undersigned counsel, bring this action against Defendants, David Callan, R. Scott Williams, Hawk Opportunity Fund L.P., Aredelmar S.A. d/b/a Arenas Del Mar Beachfront & Rainforest Resort and Playa Dulce Vida S.A. d/b/a Arenas Del Mar Beachfront & Rainforest Rosert (collectively, "Defendants") and demand damages, in a sum in excess of the local arbitration limits, exclusive of pre-judgment interest, post-judgment interest and costs, upon the causes of action set forth below.

1

**NATURE OF THE CASE**

1.      This matter involves the tragic and preventable death of MMG, a fourteen (14) year old son and brother, who passed away on March 21, 2025, as well as the individual physical and emotional harm suffered by the Decedent Minor's father, mother and brother, during a family vacation at Arenas Del Mar Beachfront & Rainforest Resort.

2.      MMG passed away following carbon monoxide poisoning with pulmonary hemorrhage and edema at the Arenas Del Mar Beachfront & Rainforest Resort.

3.      The Defendants are jointly and severally responsible for Plaintiffs' injuries because they failed to comply with basic safety standards.  A mechanical control room adjacent to Plaintiffs' rooms emitted dangerous levels of carbon monoxide because Defendants made inappropriate modifications to the hotel floor plan, placed a water heater in a dangerous location which created excess carbon monoxide, failed to maintain proper ventilation of the Mechanical Room and instead permitted the noxious fumes to enter Plaintiffs' hotel rooms causing their injuries and the death of MMG.

4.      Most alarmingly, other guests of the hotel suffered similar injuries when staying in the same guest rooms.  Even after learning of these dangerous conditions, Defendants failed to remedy these dangerous conditions, thereby unnecessarily causing the death of MMG and Plaintiffs' injuries.

**PARTIES**

**Plaintiffs**

5.      Plaintiff, Brett M. Gardner, individually and as Personal Representative of the Estate of MMG, deceased minor (hereafter, "Plaintiff"), is an adult individual, citizen and resident of the State of South Carolina.

6.     Plaintiff is a surviving parent of MMG, the deceased minor, and serves as Personal Representative of the Estate of MMG (hereafter, "Estate").  Certificate of Appointment having been granted on May 12, 2025, by the Probate Court of Dorchester County, State of South Carolina.

7.     Plaintiff decedent minor, (hereafter, "Decedent" or "MMG"), was born on October 24, 2010, and died on March 21, 2025.

8.     At the time of his untimely death, MMG was just fourteen (14) years old.

9.     MMG was a United States citizen, resident of South Carolina, on a family vacation with his parents, Brett M. Gardner and Jessica C. Gardner, Plaintiffs herein, and his older brother, HG, also a Plaintiff herein.

10.     Plaintiff, Jessica C. Gardner, is an adult individual, citizen and resident of the State of South Carolina.

11.     Mrs. Gardner is a surviving parent of MMG, the deceased minor.

12.     Plaintiff, Glen Gardner, is Conservator for HG.

13.     Plaintiff, HG, is a United States Citizen, resident of South Carolina born on November 19, 2008.  He was sixteen (16) years old at the time he suffered injuries consistent with the inhalation of carbon monoxide.  He was sharing a room with his brother MMG at the time of his younger brother's injuries and untimely death.

14.     Plaintiffs, Brett M. Gardner, individually and as Personal Representative of the Estate of MMG, deceased minor; Jessica C. Gardner; and Glen Gardner, as Conservator for HG may be collectively referred to herein as the "Gardner Plaintiffs".

3

**Defendants**

15.    Defendant, David Callan, is an adult individual, citizen and resident of the State of Pennsylvania.  David Callan is the Director and President of Aredelmar, S.A. ("Aredelmar"), the owner of the hotel, Arenas Del Mar Beachfront & Rainforest Resort ("HOTEL or Arenas Del Mar"), as well as Playa Dulce Vida, S.A. ("PDV").  Mr. Callan is the sole director with representative power for both Aredelmar and PDV, which own and manage Arenas Del Mar. Mr. Callan has held this role since approximately 2012.  Upon information and belief, he can grant, revoke or substitute power within the company as is necessary in addition to the management of the bank accounts, all in both the United States and Costa Rica.

16.    Defendant, R. Scott Williams, a resident of Pennsylvania, is and has been the Secretary of Aredelmar, the owner of Arenas Del Mar as well as PDV for many years.

17.    Defendant, Hawk Opportunity Fund L.P. ("Hawk"), is a Pennsylvania Limited Partnership, with its principal place of business located at 159 N. State Street, Newtown, PA 18940.

18.    Hawk is a venture capitalist firm owned and managed by Defendants, David Callan and R. Scott Williams.  Hawk is "designed to allow Callan and Williams to use their expertise in distressed and bankrupt securities to take major positions in those situations they deemed investment worthy. The Hawk Opportunity Fund has over $30,000,000 in assets under management."[1]  Hawk is an investor in Arenas Del Mar.

19.    Defendant, Aredelmar is the owner of Arenas Del Mar, and is a Costa Rican corporation or other legal entity, registered to do business in Costa Rica at the legal address of

---

[1] https://www.sec.gov/Archives/edgar/data/1498122/000121390018004603/f10k2017_aristafinancial.htm (last accessed March 18, 2026).

4

Avenida Escazu, Lexus Tower, Third Floor, Office 214, San Rafael, Escavu, San Jose Province, Costa Rica.  In 2023, Aredelmar purchased certain assets and liabilities from PDV, which included Arenas Del Mar. Therefore, Aredelmar and PDV are the different owners of Arenas Del Mar.

20.     Upon information and belief, Aredelmar S.A. and Playa Dulce Vida S.A are operated, managed and controlled by David Callan from Pennsylvania.

21.     Playa Dulce Vida owns certain assets and liabilities for Arenas Del Mar Beachfront & Rainforest Resort, and is a Costa Rican corporation or other legal entity, registered to do business in Costa Rica at the legal address of Avenida Escazu, Lexus Tower, Third Floor, Office 214, San Rafael, Escavu, San Jose Province, Costa Rica.

22.     Arenas Del Mar Beachfront & Rainforest Resort is a luxury 5-star hotel in Manuel Antonio, Costa Rica, which officially opened in 2008.

23.     Plaintiff is ignorant of the identities of Doe Defendants and therefore sues these defendants by such fictitious names. The Doe Defendants may be individuals, partnerships, or corporations.

24.     Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, some of the Doe Defendants were the parent, subsidiary, agent, servant, employee, co-venturer, and/or co-conspirator of Defendants, David Callan, R. Scott Williams, Hawk Opportunity Fund L.P., Aredelmar S.A. d/b/a Arenas Del Mar Beachfront & Rainforest Resort, Playa Dulce Vida S.A. d/b/a Arenas Del Mar Beachfront & Rainforest Rosert, and Arenas Del Mar Beachfront & Rainforest Resort, and were, at all times mentioned, acting within the scope, purpose, consent, knowledge, ratification and authorization of such agency, employment, joint venture and conspiracy.  Plaintiffs will amend this Complaint to allege their true names and

capacities when ascertained.  Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named Doe Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

25.     Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, some of the Doe Defendants were involved in the service, management, construction, and/or design of the hotel and its appliances.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named Doe Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

26.     Upon information and belief, David Callan and R. Scott Williams (collectively, the Individual Defendants), are responsible for the actions of the actual, apparent and/or ostensible agents, servants and employees of Defendants, Aredelmar S.A., Playa Dulce Vida S.A., and Arenas Del Mar Beachfront & Rainforest Resort (collectively, the Hotel Defendants). All such responsibilities are carried out in Pennsylvania.

27.     Upon information and belief, David Callan and R. Scott Williams conduct their business activities through their joint venture, Hawk Opportunity Fund L.P., from Pennsylvania.

28.     Upon information and belief, there existed at all relevant times a unity of interest in actions and ownership between the Individual Defendants, Hawk, and the Hotel Defendants such that independence from, or separation between, the Defendants does not exist and has never existed.  Each of them is an alter ego of the other.

6

29.     At all relevant times hereto, the Individual Defendants, including principally David Callan, were responsible for the actions of Hawk and the Hotel Defendants.

30.     The Individual Defendants, Hawk, and Hotel Defendants were: (1) engaged in the provision of services at Arenas Del Mar, and were obligated to use the skill, knowledge and care possessed by a reasonable person in performing their duties; and/or (2) acting within the course and scope of Arenas Del Mar's agency and/or role with Aredelmar S.A. and Playa Dulce Vida S.A. and under its right of control over Arenas Del Mar, and purportedly possessed skill and training for the purpose of providing proper services, safety, care, protection and candor to Arenas Del Mar and its invitees and guests, including Plaintiffs; and/or (3) engaged in the financial control over Arenas Del Mar at all material times hereto.

31.     At all times material herein, Defendants were engaged in the hospitality and tourism business through Arenas Del Mar Beachfront & Rainforest Resort.

32.     Defendants, individually and collectively, were responsible for the care and maintenance of Arenas Del Mar through the actions of their actual, apparent and/or ostensible agents, servants and employees.

<strong><u>JURISDICTION AND VENUE</u></strong>

33.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C.S. § 1332 because the matter in controversy exceeds the sum of $75,000.00 and because there is complete diversity between Plaintiffs and Defendants that at all relevant times, have engaged in continuous and systematic business activities in the Commonwealth of Pennsylvania. *See* 28 U.S.C.S. § 1332(a)(1).

**General Personal Jurisdiction**

34.    This Court has personal jurisdiction, pursuant to 42 Pa. C.S. § 5301 *et seq.*, over the Defendants because, at all relevant times, they have engaged in continuous and systematic business activities in the Commonwealth of Pennsylvania.

35.    This Court has general personal jurisdiction over Defendants, David Callan and R. Scott Williams, because they are residents of and domiciled in the Commonwealth of Pennsylvania.

36.    This Court has general personal jurisdiction over Defendant, Hawk Opportunity Fund L.P., because Hawk is registered to conduct business in Pennsylvania and therefore has consented to general personal jurisdiction in Pennsylvania, per 42 Pa. C.S. § 5301 and 42 Pa. C.S § 5322.

37.    This Court also has general personal jurisdiction over the Hotel Defendants because the Hotel Defendants are agents, subsidiaries, and/or the alter ego of David Callan, R. Scott Williams, and Hawk, and thus, for purposes of personal jurisdiction, have inextricable ties to Pennsylvania.

38.    Jurisdiction is proper as to all Defendants because Defendants, David Callan and R. Scott Williams, in all capacities, individually and as Director/President and/or Secretary for the Hotel Defendants, are residents of and principally placed in Pennsylvania.

39.    Additionally, David Callan and R. Scott Williams manage all aspects of the Hotel Defendants, from the Commonwealth of Pennsylvania, including to provide oversight to the Hotel Defendants on the ownership, management, services, design, safety, marketing, promotion, and/or sale of the Hotel Defendants' products.  The Hotel Defendants thus have inextricable ties to Pennsylvania.

8

40.     The Hotel Defendants regularly conduct business in Pennsylvania through meetings, emails, telephone conversations, as well as through charitable events and donations.

**Specific Personal Jurisdiction**

41.     This Court has specific personal jurisdiction over the Defendants due to the specific business activities related to the Arenas Del Mar Beachfront & Rainforest Resort, including but not limited to the ownership, management, services, design, safety, marketing, promotion, and/or sale of the Hotel Defendants' products that take place in parts of the Commonwealth of Pennsylvania which are located in the Eastern District of Pennsylvania.

42.     The Arenas Del Mar Beachfront & Rainforest Resort, which is where this incident occurred, is marketed, promoted, and sold to consumers in the Philadelphia region within the Eastern District of Pennsylvania.

43.     Upon information and belief, multi-night stays at Arenas Del Mar Beachfront & Rainforest Resort have been sold on multiple occasions as charitable auctions in and around the greater Philadelphia area as donated by Defendant, David Callan.  Such actions demonstrate Mr. Callan's authority over Arenas Del Mar from Pennsylvania and the substantial connection between the hotel, the Commonwealth of Pennsylvania and its residents.

44.     Venue is proper in the Eastern District of Pennsylvania because Defendants, David Callan and R. Scott Williams, live and work in this District.  *See* 28 U.S.C.S. § 1391(b)(1)&(2).

45.     Venue is also proper in the Eastern District because substantial, specific conduct by the Defendants that gave rise to this claim including the ownership, management, services, design, safety, marketing, promotion, and/or sale of the Hotel Defendants' products originated and occurred in this District.  *See* 28 U.S.C.S. § 1391(b)(2).

**FACTUAL ALLEGATIONS**

46.     Plaintiffs incorporate the paragraphs above as if set forth fully herein.

47.     On or about August 11, 2024, the Gardner Plaintiffs planned a family vacation for March 16-22, 2025, at Arenas Del Mar Beachfront & Rainforest Resort from their home in the United States.

48.     Plaintiff Jessica Gardner, corresponded with the hotel, booked and paid for their accommodations, and organized family outings and events at the hotel before arriving at the resort.

49.     The Gardner Plaintiffs traveled from South Carolina to Arenas Del Mar Beachfront & Rainforest Resort in Costa Rica arriving around 9:00 pm local time on the evening of March 16, 2025.

50.     The Gardner Plaintiffs were checked into Rooms 501A and 501B, both first floor rooms in Building 5.  Brett and Jessica Gardner were sleeping in 501A, while MMG and HG were sleeping in the adjacent room, 501B.

51.     Rooms 501A and 501B contain a kitchenette type space, minibar, small living room, bathroom with a toilet and a shower, king size bed and a closet.  Rooms 501A and 501B did not contain carbon monoxide detectors.

52.     Each room is accessible from a central shared hallway.  Between the two rooms, accessible from the hallway, was a machine/mechanical room.

53.     The Machine Room contains various equipment, including hot water tanks for both 501A and 501B, hot water heater(s), an electrical transformer and various air-conditioning and water pipes.

54.     The Machine Room did not comply with basic safety standards.  First, the location of the water heater to the Machine Room door caused a blocking of the flue outlet creating an incomplete combustion of gas and increased levels of carbon monoxide.  The Machine Room was not properly ventilated.  The doors to the Machine Room did not contain vents which would have permitted natural ventilation.  The Machine Room did not have any mechanical ventilation to direct any fumes, including but not limited to carbon monoxide, to a safe location.  Instead, the situation was aggravated by the Machine Room's connection to the neighboring guest rooms of 501A and 501B.

55.     Carbon Monoxide from the Machine Room contaminated rooms 501A and B causing injuries to the Gardner family and the death of MMG.

56.     The Gardner Plaintiffs were enjoying various activities around the area, including but not limited to fishing charters, time at the hotel beach, time at the spa, dining together at various restaurants and a zipline adventure.

57.     On or about 8:45pm local time on March 20, 2025, the Gardner Plaintiffs returned to Arenas Del Mar from dinner.  Each Plaintiff returned to their respective rooms to go to bed. The Gardner Plaintiffs were all asleep by around 10:30pm local time.

58.     At some point during the night of March 20, 2025, with a specific time unknowable, Plaintiffs Brett, Jessica and HG each woke up experiencing similar illnesses.

   a. Jessica Gardner woke up on the floor of the bathroom with no memory of how she got from the bed to the bathroom.  At some point she hit her head and cut her forehead.  She was freezing cold, nauseous and very weak. She experienced disorientation and hallucinations.
   b. Brett Gardner woke up violently ill.  He describes feeling as if he "were fighting for his life" and in "pure survival mode".  It was unlike anything he had previously experienced.  Mr. Gardner experienced multiple episodes of vomiting.  He also felt as though he were unable to use his arms or legs.

11

    c. HG also woke up violently ill surrounded by vomit. He also experienced similar feelings of paralysis. Somehow, HG was able to crawl across the floor and open the terrace door. With the fresh air, HG began to have some slow improvement in his symptoms but remained very weak.

59. MMG suffered from similar symptoms of vomiting and paralysis. HG described his brother as breathing very fast and with difficulty, sounds of struggling to catch his breath before MMG rolled over and went to sleep. MMG was rendered unconscious.

60. Around 8:30am local time, Plaintiff Jessica Gardner went from 501A to 501B to check with her children as they had not responded to the text messages she sent around 8:08am local time. The message explained that she and Brett were not feeling well and she canceled their snorkeling excursion.

61. Upon arrival in room 501B, Mrs. Gardner found HG sitting wrapped in only a towel on the couch in the room. MMG remained face down in his bed.

62. Plaintiff Jessica Gardner approached her son, MMG, in his bed. She tried to wake him up, when she noticed vomit around and in his mouth. Upon touch, she felt that his body was cold and hard. She also noticed a red rash on his leg.

63. Plaintiff HG ran to room 501A, HG and Mr. Gardner then urgently called the main desk of Arenas Del Mar pleading for help. Mr. Gardner told them that MMG was not breathing and the front desk said they could hear screams from Mrs. Gardner in the background.

64. Mrs. Gardner tried to clear the vomit from MMG's mouth and was performing CPR when the hotel staff arrived.

65.     Upon seeing Mrs. Gardner performing CPR, the hotel staff member left the room to find first-aid materials, called Urgent Care and the respective health and medical officials and returned to 501B. The staff member observed that MMG was not breathing, cold, rigid and had red spots between his legs.

66.     The respective medical team arrived and took over CPR on the bed and ultimately moved MMG to a back splint and lowered him to the floor to continue CPR.  The doctor placed an automated external defibrillator ("AED") to use; however, the AED recommended not to defibrillate.

67.     After approximately thirty to forty minutes of performing CPR, the health official pronounced MMG deceased onsite.

68.     It was also noted in the investigation report that Plaintiffs, Brett and HG both presented with redness in different parts of their body.  Specifically, it was noted to be on the thorax and legs.

69.     An autopsy was performed March 22, 2025, in Costa Rica by the Forensic Medicine Department of the Judicial Investigation Agency, the report was not finalized until May 26, 2025. The official cause of death was determined to be carbon monoxide poisoning with pulmonary hemorrhage and edema.

70.     According to the autopsy report, MMG had: "carboxyhemoglobin saturation of 54% and 74% with a frothy foam cone in the mouth, cervico-facial congestion and cherry-red discoloration of the skin, hemorrhage of both petrous bones, fluid cherry-red blood, pulmonary edema and congestion with scant subpleural petechiae, and multivisceral congestion."

71.     On or about 12:00 pm noon, March 21, 2025, Plaintiffs Brett Gardner and HG were taken to the local clinic for evaluation.  Upon arrival, they were given fluids due to the degree of emesis and illness they both experienced.  Both Brett and HG had elevated white blood cell counts noted at the clinic.  Plaintiff Jessica Gardner remained at Arenas Del Mar to meet with the necessary authorities and to gather the family belongings.  She eventually met Plaintiffs Brett Gardner and HG at the clinic.

72.     Plaintiff Brett Gardner was able to arrange for airline transportation to San Jose late in the afternoon on March 21, 2025.  Plaintiffs Brett and Jessica Gardner, along with their son, HG, flew to San Jose and spent the night in a hotel.  The next morning, they flew home to South Carolina.

73.     On March 22, 2025, the three (3) Gardner Plaintiffs arrived back at home in South Carolina around 12:00am, midnight.

74.     On March 23, 2025, the Gardner Plaintiffs went to the Medical University of South Carolina ("MUSC") for evaluation. Each Plaintiff underwent significant testing and review of symptoms, including testing for various infectious diseases.

75.     All Gardner Plaintiffs exhibited significantly higher than normal troponin levels.

76.     HG was admitted to Medical University of South Carolina, Shawn Jenkins Children's Hospital, for a more detailed evaluation and treatment overnight due to his extremely elevated troponin levels.  HG was discharged on March 24, 2025, with an activity restriction and the need for further specific testing, especially follow ups with cardiology.

77.     Plaintiff HG continued to be on activity restriction and required multiple cardiac follow up appointments through April 2025.  In fact, HG did not exhibit normal troponin levels until April 2025, several weeks after the carbon monoxide exposure.  He was not medically

cleared to return to baseball practice for a few weeks upon discharge from MUSC Shawn Jenkins

Children's Hospital demonstrating the lingering physical effects from the toxic levels of carbon

monoxide he experienced.

78.     Plaintiff Brett Gardner continued to experience effects of the toxic exposure to

carbon monoxide after returning to South Carolina.  He continued to have elevated troponin

levels and sought continued follow-up with cardiology.  Additionally, he continues to experience

numbness and paresthesia, and heaviness in his leg.

79.     MMG's body was returned home to the United States and on March 28, 2025, a

second autopsy was performed by the Department of Pathology and Lab medicine, MUSC.  The

final autopsy by MUSC confirmed that MMG's death was caused by:

> "Toxic effects of carbon monoxide
>    a.  Markedly increased postmortem carboxyhemoglobin saturation (69%)
>    b.  Red lividity and discoloration of the internal tissues
>    c.  Increased pulmonary edema
>    d.  History that the decedent was found unresponsive in his hotel room
>    e.  History that three other family members exhibited symptoms consistent with carbon monoxide toxicity
>    f.  Reported history of elevated carbon monoxide concentrations in the hotel room"

80.     As a result of the MMG's untimely death, the OIJ and Fire Departments

conducted a detailed investigation to determine the source of the carbon monoxide as required by

law.  The investigation focused on room 501B and the Machine Room adjacent to it.

81.     The Fire Department took readings for carbon monoxide at three (3) different

locations: two in the mechanical room and the third was at the pillow of the bed in room 501B

where MMG slept.

82.     The investigation determined that in room 501B there were modifications in

relation to the floor plan compared to what was observed during the room inspection.

83.     There were no carbon monoxide detectors found in the guest rooms or the Machine Room during the investigation.

84.     The investigators tested the water heater operating in its normal course as intended in the Machine Room.  Meaning that the LP burner of the hot water heater was lit and the Machine Room door was closed.  The investigators' gas detection and monitoring devices detected carbon monoxide concentrations greater than 650 ppm and oxygen levels lower than 18.2%.  These are levels that pose risk to human health.

85.     Upon information and belief, the inspection determined that carbon monoxide entered room 501B through an access window in the false ceiling of the bathroom and ultimately the bedroom.  The Fire Department determined that the ratio of oxygenated air was too low compared to the contaminated air.

86.     Authorities also determined that there were substandard safety protocols in place in the Machine Room of Building 5, which allowed carbon monoxide to enter 501B and contaminate the breathable air, thereby resulting in Plaintiffs suffering physical harm, including but not limited to the unnecessary, untimely and preventable death of MMG.

87.     Upon information and belief, several other guests from the United States, on different occasions, previously suffered from similar episodes of extreme illness during their vacation at Arenas Del Mar while staying in the same rooms.  In at least one instance, a guest required medical care and suffered similar symptoms to the Gardner Plaintiffs.

88.     As a result of Defendants' clear and unconscionable disregard for the safety of the Arenas Del Mar guests, Plaintiffs suffered significant harm, including but not limited to the death of a minor.

89.     This egregious conduct by Defendants demonstrates a willful and wanton disregard for human life and for the safety of the guests.

90.     Defendants knew or should have known that a failure to properly ventilate a Machine Room could result in significant harm, even death.

91.     Defendants should have had appropriate safety equipment in place to detect and warn of elevated levels of carbon monoxide.

92.     Upon information and belief, sometime after the inspections on March 28, 2025, Defendants placed carbon monoxide detectors in all of the guest rooms at Arenas Del Mar.

93.     If Defendants had taken the appropriate action to properly ventilate the Machine Room to prevent contaminated air from going into 501A and 501B, or had a safer hot water system, the Gardner Plaintiffs would not have suffered harm and MMG would still be alive.

94.     Upon information and belief, sometime after March 28, 2025, Defendants upgraded the water heating systems to solar powered systems and changed all backup water heating from gas to electric units to eliminate potential fire or gas leaks.

95.     Defendants' failures are the proximate cause of Plaintiffs' injuries, including the unnecessary, untimely and preventable death of MMG.

96.     The emotional, physical, and mental toll caused by Defendants' egregious failures and actions cannot be overstated.

97.     At all material times hereto, Defendants owed the highest duty of care to the Plaintiffs as public invitees and paying guests at the hotel, as more fully described in the factual allegations above, which are incorporated herein by reference.

98.     As pled below, Plaintiffs seek the application of the law of the forum state, Pennsylvania, which is also home to Defendants David Callan and R. Scott Williams.  However,

should this Court determine in a "choice of law" analysis that another jurisdiction's law should

apply to this matter, Plaintiff reserves the right to recover under the laws of that jurisdiction.

## COUNT I – NEGLIGENCE
### All Defendants

99.     Plaintiffs incorporate the paragraphs above as if fully set forth herein.

100.    At all times, Defendants were under a duty to exercise reasonable care in

providing and maintaining the five-star resort experience that Arenas Del Mar was promoted to

be, which includes the safety and well-being of the guests.

101.    Defendants are responsible for the grossly negligent and careless disregard for

safety and human life at Arenas Del Mar by their directors, executive committee, agents,

servants, workmen, and/or employees under the theory of *respondeat superior*, agency, right of

control and/or apparent authority.

102.    The general, gross and corporate negligence/systemic failure of Defendants, by

and through their actual, apparent and/or ostensible agents, officers, directors including, but not

limited to, Arenas Del Mar Beachfront & Rainforest Resort, Aredelmar S.A. and Playa Dulce

Vida S.A., consisted of one or more of the following acts or omissions:

a.     Failure to recognize that Plaintiffs were in danger of toxic exposure;
b.     Failure to properly and appropriately ventilate the Machine Room;
c.     Failure to recognize, investigate and/or correct a known risk of toxic exposure;
d.     Failure to adequately monitor for toxic exposure;
e.     Negligently altering the Machine Room discharge causing the discharge of carbon monoxide into guest rooms;
f.     Failure to perform the duties owed to a resort guest in a manner that a prudent person or entity would;
g.     Failure to remedy a known risk;
h.     Failure to adequately oversee, maintain and provide a safe environment at Arenas Del Mar;
i.     Failure to install and maintain safety equipment to detect and warn of elevated levels of carbon monoxide;

j. Recklessly disregarding a known risk of harm which led to physical injury of Plaintiffs, including but not limited to the unnecessary, untimely and preventable death of MMG;

k. Willfully ignoring signs of a possible issue in rooms 501A and 501B after multiple guests experienced illness;

l. Failure to act with a duty of care owed to prevent the unnecessary injuries suffered by Plaintiffs, especially the unnecessary, untimely and preventable death of MMG.

103. The conduct of Defendants, individually and collectively, constitutes gross negligence, recklessness, and/or a willful and wanton disregard for the safety and well-being of Plaintiffs.

104. As a result of Defendants' negligence, Plaintiffs suffered devastating injuries, including the unnecessary, untimely and preventable death of MMG, including but not limited to the following:

a. Carbon monoxide poisoning at lethal levels;

b. Carbon Monoxide poisoning at toxic levels resulting in severe nausea and vomiting;

c. Paralysis and/or weakness of the arms and legs;

d. Elevated troponin levels;

e. Fear for safety, recovery and well-being;

f. Severe emotional distress;

g. Pain and suffering;

h. Mental anguish;

i. Helplessness;

j. Loss of a minor child/sibling;

k. Future loss of life's pleasures;

l. Inability to engage in the usual household, family and social activities;

m. Such other injuries and conditions documented in Plaintiffs' medical records; and

n. Death.

105. Defendants' breaches, failures and negligence, as set forth in this Complaint, increased the risk of harm to Plaintiffs and caused them to suffer irreparable harm.

106. The gross negligence of Defendants increased the risk of harm to Plaintiffs and was the cause of Plaintiff MMG's unnecessary, untimely and preventable death.

19

107. Defendants were aware, or should have been aware, of the foreseeable and substantial risk of injury under these circumstances.

108. As a direct and proximate result of the negligent and grossly negligent acts and omissions of Defendants, as described herein, Plaintiffs suffered irreparable injury and harm, including the loss of life.

109. Defendants are liable in tort to Plaintiffs for their negligent conduct pursuant to common and statutory law.

**WHEREFORE**, for the above reasons Plaintiffs demand judgment in their favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

## COUNT II – NEGLIGENCE
### David Callan, R. Scott Williams, and Hawk

110. Plaintiffs incorporate the paragraphs above as if fully set forth herein.

111. Defendants, David Callan, R. Scott Williams, by and through their venture capital firm, Defendant, Hawk Opportunity Fund L.P., had a duty and obligation to Plaintiffs and patrons of the Hotel Defendants through the financial control asserted by Callan, Williams, and Hawk over the Hotel Defendants at all times material hereto.

112. Upon information and belief, Defendants, David Callan, R. Scott Williams, by and through their venture capital firm, Defendant, Hawk Opportunity Fund L.P., financially controlled and dominated the Hotel Defendants to the extent that there was no separation amongst these entities.

113. Defendants, David Callan, R. Scott Williams, by and through their venture capital firm, Defendant, Hawk Opportunity Fund L.P., maintained financial control and domination over the Hotel Defendants that led to the negligent acts and/or omissions pled herein.

114. As a result of Defendants' negligence, Plaintiffs suffered devastating injuries, including but not limited to, the unnecessary, untimely and preventable death of MMG, including but not limited to the following:

    a.    Carbon monoxide poisoning at lethal levels;
    b.    Carbon Monoxide poisoning at toxic levels resulting in severe nausea and vomiting;
    c.    Paralysis and/or weakness of the arms and legs;
    d.    Fear for safety, recovery and well-being;
    e.    Severe emotional distress;
    f.    Pain and suffering;
    g.    Mental anguish;
    h.    Helplessness;
    i.    Loss of a minor child/sibling;
    j.    Future loss of life's pleasures;
    k.    Inability to engage in the usual household, family and social activities;
    l.    Such other injuries and conditions documented in Plaintiffs' medical records; and
    m.    Death.

115. Defendants' breaches, failures and negligence, as set forth in this Complaint, increased the risk of harm to Plaintiffs and caused them to suffer irreparable harm.

116. The negligence of Defendants increased the risk of harm to Plaintiffs and was the cause of Plaintiff MMG's unnecessary, untimely and preventable death.

117. Defendants were aware, or should have been aware, of the foreseeable and substantial risk of injury under these circumstances.

118. As a direct and proximate result of the negligent and grossly negligent acts and omissions of Defendants, as described herein, Plaintiffs suffered irreparable injury and harm, including the loss of life.

119.    Defendants are liable in tort to Plaintiffs for their negligent conduct pursuant to common and statutory law.

**WHEREFORE**, for the above reasons Plaintiffs demand judgment in their favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

**COUNT III – VICARIOUS LIABILITY**
**All Defendants**

120.    Plaintiffs incorporate the paragraphs above as if fully set forth herein.

121.    Defendants are liable for the grossly negligent acts or omissions of its actual, apparent and/or ostensible agents, servants and employees under theories of *respondeat superior*, master-servant, agency, ostensible agency and right of control, whose identities include those that knew of or should have known of the faulty ventilation into Building 5, rooms 501A and B, which caused the injuries to the Plaintiffs and ultimately the untimely death of the MMG, the deceased Plaintiff.

122.    Defendants are liable to Plaintiffs under a theory of vicarious liability pursuant to common and statutory law.

**WHEREFORE**, for the above reasons Plaintiffs demand judgment in their favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

## COUNT IV – BREACH OF WARRANTY (EXPRESS AND IMPLIED)
### All Defendants

123.    Plaintiffs incorporate the paragraphs above as if set forth fully herein.

124.    At all times material herein, Defendants were engaged in the hospitality and tourism business through Arenas Del Mar Beachfront & Rainforest Resort.

125.    At all relevant times hereto, Defendants owed a duty of care, protection, security, safety and candor to the guests of Arenas Del Mar Beachfront & Rainforest Resort, including Plaintiffs.

126.    At all times material herein, Defendants owed a duty of reasonable care to provide and maintain the five-star resort experience that Arenas Del Mar was promoted to be, that which Plaintiffs contracted with Arenas Del Mar and that which included the responsibility to provide a safe facility.

127.    Arenas Del Mar was promoted to be a place people can "travel with confidence" and have an unforgettable and luxurious experience, "the only luxury hotel in Manuel Antonio on the beach."[2]

128.    Defendants owed a duty to its guests that Arenas Del Mar was of a certain quality, safe and fit for its intended use and purposes

129.    At all times material herein, Plaintiffs engaged in activities and experiences that are promoted and contemplated by Defendants as part of the experience of being at Arenas Del Mar.

---

[2]Arenas Del Mar (last accessed March 18, 2026).

130.    At all times material herein, Plaintiffs engaged in, around and within Arenas Del Mar in the manner that was foreseeable and in accordance with the normal, intended, recommended and/or marketed purposes of Arenas Del Mar.

131.    Defendants made modifications to its facilities that made Arenas Del Mar unsafe and unfit for its intended use and purposes for which it warranted was above any other in the area.

132.    Defendants put economics above the safety of their guests allowing carbon monoxide to enter 501A and 501B, contaminating the breathable air.

133.    The harm caused by Defendants' disregard for their responsibilities and duties to its guests far outweighed any benefit Plaintiffs could ever experience, which made Arenas Del Mar unsafe and unfit for its intended purpose as alleged herein.

134.    Arenas Del Mar was more dangerous than the average consumer would expect and more dangerous than other similar facilities.

135.    As a direct and proximate result of Defendants' breach of the express and implied warranties of safety, habitability and fitness for a particular purpose, Plaintiffs have endured irreparable harm, including but not limited to physical harm, including an unnecessary, untimely and preventable death of a minor.

136.    As a direct and proximate result of Defendants' carelessness and negligence, Plaintiffs suffered severe and permanent physical and emotional injuries, including but not limited to the loss of life and will continue to suffer from such injuries.

137.    Defendants are liable in tort to Plaintiffs for their breach of warranty pursuant to common and statutory law.

**WHEREFORE**, for the above reasons Plaintiffs demand judgment in their favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

**COUNT V – WRONGFUL DEATH ACT**
**All Defendants**

138.    Plaintiffs incorporate the paragraphs above as if set forth fully herein.

139.    Plaintiffs bring this Wrongful Death Action on behalf of the Estate of MMG under and by virtue of the Wrongful Death Act, 42 Pa. C.S.A. § 8301 and the applicable Rules of Civil Procedure and decisional law.

140.    Under the Wrongful Death Act, Decedent left surviving as heirs-at-law, his parents, Brett and Jessica Gardner (both Plaintiffs herein).

141.    As a result of the negligent acts and omissions of Defendants, as described more fully herein, Decedent Minor, MMG, suffered catastrophic and fatal injuries leading to his death, resulting in the entitlement to damages by the aforementioned beneficiaries under the Wrongful Death Act.

142.    Plaintiffs claim the full measure of damages recoverable under and by virtue of the Wrongful Death Act, applicable Rules of Civil Procedure and decisional law.

143.    Plaintiffs claim damages for the pecuniary losses suffered by reason of the death of Decedent, including but not limited to, damages for all related expenses, including but not limited to medical expenses, expenses related to transportation back to the United States, funeral

25

and burial expenses and the costs of estate administration necessitated by reason of the negligence and injuries which caused Decedent's death.

144.    Plaintiffs claim damages for loss of future earnings, support, comfort, care, society, guidance, tutelage and/or other losses recognized under the Wrongful Death Act, which the Wrongful Death beneficiaries would have received from Decedent had his death not occurred.

145.    Plaintiffs claim damages for the monetary support that Decedent could have been expected to provide to the Wrongful Death beneficiaries during his lifetime had his death not occurred.

146.    Plaintiffs claim damages for the pecuniary value of services which Decedent could have been expected to provide to the Wrongful Death beneficiaries during his lifetime had his death not occurred.

147.    Defendants are liable in tort to Plaintiffs for their wrongful conduct pursuant to common and statutory law.

**WHEREFORE**, for the above reasons Plaintiffs demand judgment in their favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

## COUNT VI – SURVIVAL ACT
### All Defendants

148.    The previous paragraphs are incorporated by reference as though fully set forth herein.

149.    Plaintiffs bring this Survival Action on behalf of the Estate of MMG under and by virtue of the Survival Act, 42 Pa. C.S.A. § 8302 and the applicable Rules of Civil Procedure and decisional law.

150.    As a result of the negligent acts and omissions of Defendants, as described more fully herein, Decedent Minor, MMG, suffered catastrophic and fatal injuries leading to his death, resulting in the entitlement to damages by Decedent's Estate, under the Survival Act.

151.    Plaintiffs bring this action to recover on behalf of Decedent's Estate to recover the full measure of damages recoverable under and by virtue of the Survival Act, applicable Rules of Civil Procedure and decisional law.

152.    Plaintiffs claim damages for all economic losses for the Estate, including but not limited to, Decedent's total estimated future earning capacity, less his personal maintenance costs.

153.    On behalf of Decedent's Estate, Plaintiffs claim damages for physical discomfort, conscious pain and suffering, loss of enjoyment of life's pleasures and all other damages and losses recoverable under and by virtue of the Survival Act, applicable Rules of Civil Procedure and decisional law.

154.    Defendants are liable in tort to Plaintiffs for their wrongful conduct pursuant to common and statutory law.

**WHEREFORE**, for the above reasons Plaintiffs demand judgment in their favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

## COUNT VII – LOSS OF FILIAL CONSORTIUM
### All Defendants

155.    The previous paragraphs are incorporated by reference as though fully set forth herein.

156.    At all times material, Plaintiffs, Brett M. Gardner and Jessica C. Gardner, were the parents and guardians of Decedent Minor, MMG.

157.    As a result of the damages, injuries, and death sustained by Decedent Minor, MMG, Plaintiffs have suffered the loss of care, comfort, society and affections from MMG.

158.    As a result of Defendants' negligence, which caused Decedent Minor's death, Plaintiffs lost the consortium of their minor-son.

159.    Defendants are liable in tort to Plaintiffs for their wrongful conduct pursuant to common and statutory law.

**WHEREFORE**, for the above reasons Plaintiffs demand judgment in their favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

## COUNT VIII – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### All Defendants

160. The previous paragraphs are incorporated by reference as though fully set forth herein.

161. Defendants' negligence and recklessness caused the death of Decedent Minor, MMG, and Plaintiffs' additional injuries outlined more fully herein.

162. Plaintiffs, Brett M. Gardner, Jessica C. Gardner, and HG, shared a familial relationship with Decedent Minor, MMG.

163. Plaintiffs, Brett M. Gardner, Jessica C. Gardner, and HG, were on the premises at the time of this incident, and within the zone of danger of the carbon monoxide poisoning that caused MMG's death.

164. Plaintiffs had both a sensory and contemporaneous observation of Decedent Minor's death and were also physically injured by the same carbon monoxide poisoning.

165. Plaintiffs reasonably feared impending physical injury as a result of this incident.

166. Plaintiffs, Brett M. Gardner, Jessica C. Gardner, and HG, suffered and continue to suffer severe and permanent emotional distress as a result of witnessing the death of Decedent Minor, MMG.

167. Plaintiffs, Brett M. Gardner, Jessica C. Gardner, and HG, suffered and continue to suffer, severe and permanent emotional distress as a result of their own physical injuries caused by Defendants' negligence.

168. Plaintiffs, Brett M. Gardner, Jessica C. Gardner, and HG, suffered and continue to suffer severe and permanent emotional distress as a result of being bystanders and in the zone of danger of the carbon monoxide poisoning that caused MMG's death.

169.    Plaintiffs' severe and permanent emotional distress has also resulted in physical manifestations, including severe physical pain, illness, and discomfort.

170.    Defendants are liable in tort to Plaintiffs for their wrongful conduct pursuant to common and statutory law.

**WHEREFORE**, for the above reasons Plaintiffs demand judgment in their favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

## COUNT IX – GROSS NEGLIGENCE / RECKLESSNESS
### All Defendants

171.    The previous paragraphs are incorporated by reference as though fully set forth herein.

172.    Defendants' aforementioned conduct was aggravated by the kind of malice  and grossly negligent disregard for the rights of others, the public, and Plaintiffs, for which the law would allow, and which Plaintiffs will seek at the appropriate time under governing law for the imposition of exemplary (or, punitive) damages, in that Defendants' conduct when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious and reckless disregard to the rights, safety, or welfare of others.

173.    Defendants ignored or disregarded the dangerous risks associated with carbon monoxide poisoning, despite modifications to the floor plan and reported history of incidents of illness in the same hotel rooms.

30

174.    Defendants' ignorance of the aforementioned risks was ongoing through the trip, including the date(s) of injury on the night of March 20, 2025, continuing to March 21, 2025.

175.    Given the Defendants' inherent knowledge and awareness of the risk of carbon monoxide poisoning, and its propensity to cause severe and fatal injuries, Defendants' failure to ensure that the property was safe and habitable constitutes gross negligence, malice, and a reckless disregard for the safety of Plaintiffs, Decedent Minor and others.

176.    Plaintiffs relied on the Defendants to provide a safe and habitable property, and Plaintiffs and Decedent Minor suffered catastrophic injuries, including death, as a result of Defendants' failure to do so.

177.    Plaintiffs therefore will seek to assert claims for exemplary damages at the appropriate time under governing law in an amount within the jurisdictional limits of the Court.

178.    Plaintiffs will seek to assert claims for exemplary damages to the extent available under all applicable laws.

179.    Plaintiffs also allege that the acts and omissions of Defendants, whether taken singularly or in combination with others, constitutes gross negligence that proximately caused Plaintiffs' injuries.  In that regard, Plaintiffs will seek exemplary damages in an amount that would punish Defendants for their conduct, and which would deter others from engaging in such misconduct in the future.

180.    Defendants are liable in tort to Plaintiffs for their grossly negligent and reckless conduct pursuant to common and statutory law.

**WHEREFORE**, for the above reasons Plaintiffs demand judgment in their favor against all named Defendants, jointly, severally and/or individually for compensatory damages, pain and suffering, punitive damages and such other recoverable damages, in an amount in excess of the

jurisdictional requirement to guarantee a jury trial, plus costs and delay damages, and such other relief the Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully demand judgment against Defendants, individually, jointly and severally, and request compensatory damages, together with interest, cost of suit, and all such other relief as the Court deems just and proper as well as:

a. For compensatory and general damages in a sum in excess of the jurisdictional minimum of this Court;

b. For past and future medical, incidental, hospital, transportation from abroad back to the United States, funeral and burial expenses according to proof:

c. For past and future pain and suffering, mental anguish and diminished enjoyment of life;

d. For pre-judgment and post-judgment interest as is provided by law;

e. For past and future loss of earnings and/or earning capacity, according to proof;

f. For consequential damages in excess of the jurisdictional minimum of this Court;

g. For punitive damages in an amount in excess of any jurisdictional minimum of this Court and in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

h. For attorneys' fees, expenses and costs of this action;

i. Damages for loss of a child, sibling and the loss of life's pleasures and the inability to engage in the usual household, family and social activities;

j. For Decedent Minor's conscious pain and suffering; and

k. For such further relief as this Court deems necessary, just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts and as to all issues.

Dated: March 20, 2026                               Respectfully submitted,

                                                   /s/ Mike Daly
                                                   Mike Daly

                                                   Mike Daly (PA ID No. 309911)
                                                   mdaly@motleyrice.com
                                                   Joshua Neuman (PA ID No. 322648)
                                                   jneuman@motleyrice.com
                                                   Motley Rice LLC
                                                   Three Logan Square
                                                   1717 Arch Street, Suite 3610
                                                   Philadelphia, Pennsylvania 19103
                                                   Phone: (267) 267-4740
                                                   Fax: (267) 267-4759

                                                   Joseph F. Rice*
                                                   jrice@motleyrice.com
                                                   Michael Elsner*
                                                   melsner@motleyrice.com
                                                   Ann E. Rice Ervin*
                                                   ariceervin@motleyrice.com
                                                   Donald Migliori*
                                                   dmigliori@motleyrice.com
                                                   Motley Rice LLC
                                                   28 Bridgeside Boulevard
                                                   Mount Pleasant, South Carolina 29464
                                                   Phone: (843)216-9000
                                                   Fax: (843) 216-9635

                                                   *Pro Hac Vice forthcoming